# United States Court of Appeals
## For the First Circuit

No. 01-1037

BERNARD DREIBLATT, ET AL., TRUSTEES OF THE
SHIPWAY PLACE CONDOMINIUM ASSOCIATION,

Plaintiffs, Appellants,

v.

ST. PAUL FIRE AND MARINE INSURANCE CO.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Boudin, Chief Judge,

Gibson,[*] Senior Circuit Judge,

and Torruella, Circuit Judge.

Dana A. Curhan, with whom William T. Kennedy and Robert A. Koditek were on brief for appellants.
Susan J. Condon, with whom Clausen Miller P.C. was on brief for appellee.

---

[*] Of the Eighth Circuit, sitting by designation.

September 10, 2001

**TORRUELLA, Circuit Judge.** The Shipway Place Condominium ("Shipway") suffered extensive roof damage which appellants[1] attribute to a particularly heavy snowstorm that fell in the Boston area on April 1, 1997. Appellee St. Paul Fire and Marine Insurance Company (St. Paul) denied coverage after concluding that: (i) no "collapse" had occurred, as required by the insurance policy; and (ii) any collapse that did occur was not caused by the heavy snow, but resulted from corrosion damage explicitly excluded by the policy. Appellants brought suit for breach of contract. The district court granted summary judgment to St. Paul. Dreiblatt v. St. Paul Fire & Marine Ins. Co., No. 99-11334-DPW, at 27 (D. Mass. Dec. 7, 2000). This appeal followed. We agree with the district court's determination that no "collapse" occurred under Massachusetts law, and affirm on that basis.

## BACKGROUND

We review a grant of summary judgment de novo, with the facts taken in the light most favorable to the non-moving party. Coyne v. Taber Partners I, 53 F.3d 454, 457 (1st Cir. 1995). The material facts, which we review here, are essentially undisputed.[2]

---

[1] Appellants are individual trustees of the Shipway Place Condominium Association. Throughout the opinion, we refer interchangeably to the condominium and the appellants as "Shipway."

[2] In their brief to this Court, appellants rely on the facts as set forth by the district court in its memorandum and order.

Shipway Place is a nine building condominium complex in Charlestown, Massachusetts.  The roofs of all nine buildings are flat, with a structure consisting of wood trusses supported by wood and metal webs and covered with plywood sheathing.  The roof exterior is covered with a rubber membrane weighed down by stones for ballast.  The ceiling of the top unit in each apartment building is made of plaster attached directly to the roof structure.

Shipway's insurance policy is provided by St. Paul.  The policy insures "against the risk of direct physical loss or damage involving collapse of a building or any part of a building" due to causes including the "weight of ice and snow or sleet."  The policy does not define the term "collapse," but provides that "[c]ollapse doesn't include settling, cracking, bulging, shrinking, or expansion."  The policy also specifically denies coverage for loss "caused or made worse" by "wear and tear" or "deterioration, mold, wet or dry rot, rust or corrosion."

On April 1, 1997, a heavy snow fell on Boston.  Following the storm, the owners of Shipway Unit 33 returned to their condominium to discover that their living room ceiling was "hanging down a couple of inches."  The ceiling was repaired in September 1997 and St. Paul paid for the damage.[3]

---

[3] There is some dispute over whether this payment was to cover damages caused by the April snowstorm. Dreiblatt, No. 99-11334-DPW, at 2-3. The district court assumed that it was for purposes of summary

During the course of repairing the roof to Unit 33, Shipway discovered extensive damage to its internal support structure. The engineering firm of Simpson, Gumpertz & Heger (SGH) was hired to investigate the problem further. In the course of its investigation, SGH found that several of the metal trusses in the roof to Unit 33 were "failed and severely corroded," and that the problem extended to roof supports in many of the other units. In a November 18, 1997 report, SGH warned that "a collapse of the roof structure is possible." Based on further study, in July 1998, Shipway gave notice to St. Paul that it sought to claim damage to all nine buildings based on the April 1997 snowstorm. St. Paul denied the claim.

Four other entities evaluated Shipway's roof damage after SGH. In November 1998, city inspector Jay Duca evaluated the ceilings of Units 32 and 34. He concluded that at least some parts of the roof system had rusted and deteriorated, and issued a citation warning the unit owners that the ceilings needed to be repaired. In deposition testimony, Duca indicated that he did not feel that a collapse had occurred prior to his visit; however, he testified that he had warned owners that "there was a danger of a collapse of the roof." He also noted that "it looked like there was some deflection [in the roof], but [that the deflection] could have been normal."

---

judgment, id. at 3, and we do the same.

Also in November 1998, Shipway hired engineering firm C.I.D. Associates (CID) to provide a second opinion. A CID report indicated findings of deterioration, collapse, flaking and de-lamination of metal webbing, sagging or failure of the plywood roof deck, and collapse of the ceiling onto the floor in various units.[4] The report's author, Paul O'Connor, testified only that he observed puddles of water on some of the roofs, and that such "ponding" may suggest a sagging roof structure.

In January 1999, Medeiros Property Management Consulting conducted "deflection readings" on all of the Shipway units.[5] A number of the deflections measured exceeded that allowable under the Massachusetts Building Code (3/16 of an inch) but none of the measurements showed deflection of greater than one inch. Based on these deflection readings, expert Rene Mugnier testified that one could conclude from the deflection readings that there had been a complete collapse of the plywood deck resulting from the snowstorm. Mugnier did not base his deduction on any legal definition of the word "collapse."

---

[4] Appellants have submitted no other evidence indicating that any ceilings had collapsed to the floor. The district court held that, to the extent the CID report was offered to support factual allegations about the physical state of the building, it was inadmissible hearsay. Dreiblatt, No. 99-11334-DPW, at 5. Appellants have not challenged this conclusion, and do not rely on the report in their appeal.

[5] A "deflection reading" indicates the amount of sag in a roof structure.

Lastly, Wiss, Janney and Elster Associates (WJE), an engineering firm retained by St. Paul, examined the roof systems in 1999 while they were being repaired.  In a May 14, 1999 report evaluating three of the units, WJE determined that although there had been differing amounts of corrosion within the roof, and "some deflection of the roof system" due to load redistribution, the "load redistribution and the associated deflections do not constitute a collapse."  In later reports, WJE indicated that its evaluation of the remaining units was "generally consistent" with this conclusion.

The district court, relying on Clendenning v. Worcester Ins. Co., 700 N.E.2d 846 (Mass. App. Ct. 1998), concluded that there had been no collapse under Massachusetts law.  Dreiblatt, No. 99-11334-DPW, at 17.  The court held that a collapse "must include a sudden and completed event that results in a noticeably altered appearance."  Id. at 16.  In other words, under Massachusetts law, a collapse has three elements: suddenness, a perceptible change in appearance, and completeness.  The court also held that evidence of internal deterioration within the roof structure was insufficient under Clendenning, given that the roof still performed its basic functions:

> [A collapse] must result in some significant
> primary . . . element of the structure becoming
> disengaged or falling down so that it no longer
> is performing its characteristic function in the
> building.  The requirements of a "collapse"
> cannot be satisfied by mere "flaking" or
> "bending," nor may it be satisfied by

-7-

> compression, shifting, sagging, or "deflection"
> of a few inches.  The breakdown of subsidiary
> elements such as several metal webs is not in
> itself sufficient to constitute a collapse.

Id. at 16-17; see also id. at 12 ("[T]he Clendenning opinion . . . cannot support the proposition that an arguably sagging roof, or deteriorating support system that had become structurally unsound but had not fallen in or become detached from the pertinent structures, is a 'collapse.'").

The court also determined that St. Paul had not abandoned the policy's definition of "collapse" by either evidentiary admission or estoppel, id. at 17-21,[6] and that even if there had been a collapse, it resulted not from the heavy snowstorm but from long-term wear and tear (corrosion) explicitly excluded by the St. Paul policy, id. at 27.[7]

**DISCUSSION**

Appellants do not challenge the facts recited by the district court in making its determination, nor do they argue with the district court's use of Clendenning as the source of the Massachusetts law of collapse.  Instead, they make a two-prong argument.  First, they suggest that the district court's refusal to consider an unseen failure of structural elements within an enclosed roof system to be a potential "collapse" was erroneous.  Appellants argue that "a loss of structural

___

[6]  Appellants do not challenge this holding on appeal.

[7]  Appellants also challenge this aspect of the district court's holding.  We affirm without having to reach the question of causation.

integrity coupled with some movement or alteration of the appearance of a portion of the building" could indeed be a collapse under Massachusetts law. Second, they argue that under this revised definition, they introduced sufficient facts to survive summary judgment: (i) that structural elements within the Shipway roof failed and in some instances became detached; (ii) that ceilings sagged perceptibly; (iii) that there were measurable deflection readings; and (iv) that there was "ponding" on roof surfaces.

We are not persuaded. Appellants do not challenge the district court's requirement that the collapse result in a "noticeably altered physical appearance." Id. at 16; see also Clendenning, 700 N.E.2d at 660 (requiring "a visual element of altered appearance that comprises a structural collapse, distinct from the degenerative process causing the collapse"). In fact, appellants' own definition contemplates that there be "some movement or alteration of the appearance of a portion of the building" (emphasis added). Moreover, in support of their position, they claim that there was "a clear visual element of altered appearance." The district court found that appellants had adduced no evidence of externally observable changes in the roof's appearance, and our review of the record confirms this determination.

First, there is no evidence that any roof (other than that of Unit 33) sagged perceptibly to the naked eye. Not only have

-9-

appellants not pointed us towards any testimony of perceptible sagging in their appellate brief, but our careful review of the various engineering reports in the record has not discerned any such testimony. As the district court pointed out, with the exception of Unit 33, "there is no evidence that any resident complained of, or even noticed, any damage to a ceiling." Second, although the roof deflection was measurable using a specialized apparatus called a "story pole," and was significant enough in some cases to violate the Massachusetts building code, appellants have not suggested that a deflection of less than one inch can be perceived without engineering knowledge and equipment. We agree with the district court that, as a matter of law, a deflection of less than one inch is insufficient to create a "noticeably altered physical appearance" in the building. The policy's exclusion of "settling, cracking, bulging, shrinking or expansion" from the definition of a collapse further supports the determination that de minimus deflection does not meet the legal definition of collapse. Third, although there may have been observable post-snowstorm "ponding" on the Shipway roofs, appellants have introduced no evidence that the "ponding" is a post-collapse phenomenon. A collapse requires that there have been a change in appearance; lacking any evidence that the "ponding" observed in 1999 had not always occurred on the allegedly "previously flat" roofs, this evidentiary requirement is not met.

Appellants also argue that under Clendenning, the relevant changes to the roof's appearance may occur within the space between the ceiling and the outer roof. To this end, appellants point to evidence of observable damage to the roof's internal support structure not revealed until workers entered that space to make repairs. We can posit a situation in which the elements of Clendenning are satisfied, but no damage is visible either from within the apartment itself or from outside the building: for example, if many of the metal pieces comprising the roof's internal support structure detached from one another, yet somehow the outer roof and ceiling remained intact as an apparently unchanged "shell" with no ability to support any weight. Such was not the case here. At best, appellants introduced evidence that several of the metal supports had become detached, and that others were corroded, but that most remained in place. Moreover, the evidence, even when viewed in the most favorable light to the appellant, indicates that the outer roof and ceiling were more than a "shell," and were in fact capable of supporting normal roof loads. Even if Clendenning allows hidden changes such as these as sufficient visual evidence of a collapse, it requires a more complete deterioration than is revealed in the evidence submitted here. Id. at 661 ("The hidden destructive process must run its full course to be insurable. . . . There are no degrees of collapse.").

This concludes our analysis. Even if the district court offered a narrower definition of collapse than that provided for by Massachusetts law in <u>Clendenning</u>, appellants have not introduced sufficient evidence to satisfy that aspect of the definition with which they agree, nor have they placed any material facts sufficiently at issue to require a jury trial. Summary judgment was therefore appropriate.

**Affirmed**.